No. 12-17080

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

In re: YAHOO! INC. SECURITIES LITIGATION

PENSION TRUST FUND FOR OPERATING ENGINEERS, on Behalf of Itself
and All Others Similarly Situated,
*Plaintiff-Appellant*,

vs.

YAHOO! INC., CAROL A. BARTZ, JERRY YANG, TIMOTHY R. MORSE,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
No. 3:11-cv-02732-CRB
The Honorable Charles R. Breyer

APPELLANT'S OPENING BRIEF

ROBBINS GELLER RUDMAN
& DOWD LLP
SANFORD SVETCOV (36561)
SUSAN K. ALEXANDER (124276)
ANDREW S. LOVE (119990)
CHRISTOPHER P. SEEFER (201197)
ARMEN ZOHRABIAN (230492)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff-Appellant

# FRAP 26.1 DISCLOSURE STATEMENT

Appellant, Pension Trust Fund for Operating Engineers, is not a "corporate party," does not issue stock, and is not controlled by any publicly held corporation.

s/Susan K. Alexander

SUSAN K. ALEXANDER

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .........................................................................1

II.    JURISDICTION ...........................................................................2

III.   ISSUES PRESENTED .................................................................3

IV.   STATEMENT OF THE CASE .....................................................4

      A.    Nature of the Case .............................................................4

      B.    Course of Proceedings; Disposition ....................................4

V.    STATEMENT OF FACTS ...........................................................5

      A.    Prior to the Class Period, Defendants Cultivated and Nurtured a Market Understanding that Its Investment in the Alibaba Group – China's E-Commerce Leader – Was Enormously and Increasingly Valuable ...............................................................5

            1.    The Alibaba Group's Most Valuable Assets Were Its Privately Held Companies – Alipay (Similar to PayPal) and Taobao (Similar to eBay) – Which Defendants Assured Investors Held "Significant Additional Value" ...........6

            2.    Yahoo CFO Morse and CEO Bartz Explicitly Raved to Investors About the Alibaba Group's "Significant Source of Long-Term Value," Bringing "Dollars into Our Coffers Every Quarter" with Anticipated "Enormous Explosive Growth" – While Reassuring Investors that Defendants Had No Plans "to Liquidate, Spin-Off or Otherwise Dispose of" the Alibaba Group Assets ......................7

            3.    Analysts Echoed Defendants' Enthusiasm, Calling Yahoo's 40% Stake in the Alibaba Group's "Still-Private Holdings" – Alipay and Taobao – "Yahoo's Most Valuable Asset" ...........................................................9

**Page**

4. Yahoo Co-Founder, Officer, and Director Jerry Yang Served on the Alibaba Group Board – a Fact that Defendants Claimed Allowed Them to Be "Always Evaluating" the Alibaba Investment ..........................................10

B. Defendants Admitted They Knew for Years Before the Class Period that Yahoo's Foreign Ownership of the Chinese Companies Was Potentially Untenable – and Admitted "Following Developments" When China Made Foreign Ownership Effectively Impossible in June 2010 ...............................11

C. On August 6, 2010, the Alibaba Group Transferred All of Its Alipay Shares – Valued at $5-$6 Billion – to a Chinese Company Run by Jack Ma for Only $46 Million – and, Within Six Months, Gave Up All Control of Alipay ......................................13

1. The "Sale" Translated to a Loss of 99% of Alipay's Value for Investors – but Initially Left the Alibaba Group with Control of Alipay ............................................................13

2. On January 27, 2011, the Alibaba Group Terminated Its Foreign Ownership Agreement with Yahoo, Meaning that Yahoo No Longer Had Any Control Over Alipay.............14

D. Defendants Concealed the Massive Loss from Investors for Nine Months – Including Six Weeks After Defendants Admit They Knew About the Loss.................................................................15

1. After the August 6, 2010 Transfer of 100% of Alipay's Stock, Defendants Continued to Speak as Though Alipay Was Still a Source of Value to Yahoo ......................................15

2. On April 19, 2011, Defendants Spoke to Investors About the Alibaba Group Private Businesses, Misleading Investors to Believe that Yahoo Still Owned Its Valuable Asset ..........................................................................................18

- ii -

**Page**

   3. On May 10, 2011, Defendants Continued to Mislead Investors About the Value of Yahoo's Alibaba Group Investment ................................................................... 18

 E. Contemporaneous Reports by Others Involved in the Transactions Strongly Suggest that Defendants Knew About the Stock and Control Agreement Transfers in August 2010 and January 2011, When They Occurred ................................................... 21

   1. The Alibaba Group Board – of Which Yahoo Co-Founder and Director Jerry Yang Was a Member – Immediately Publicly Corrected Yahoo's Statements, Explaining the Board Knew in July 2009 that a Majority of Alipay's Shares Had Been Transferred into Chinese Ownership ................................................................... 21

   2. In June 2011, Alibaba Group CEO Jack Ma Publicly Stated Defendants Knew About the Stock Transfer and Termination of the Control Agreements When They Happened – in August 2010 and January 2011 ........................ 22

   3. Defendants Admit that They Knew About the Changed Value and Ownership by at Least March 31, 2011 – but Still Never Corrected the False-When-Made Statements They Had Been Making Since the August 6, 2010 Transfer ................................................................... 24

 F. From May 13, 2011 to July 28, 2011, Defendants Not Only Never Denied Direct Accusations that They Knew About the Alipay Transfers When They Happened – but Also Created an Expectation that They Were Negotiating a Fair Resolution for Investors ............................................................... 24

 G. On July 29, 2011, Defendants Revealed a "Resolution" Well Below the Value of Alipay They Had Conditioned the Market to Expect and the Impact of the Fraud Was Finally Fully Felt .......... 28

772932_1

**Page**

VI.    DISTRICT COURT RULING...................................................................29

VII.   STANDARD OF REVIEW ................................................................30

VIII. SUMMARY OF ARGUMENT ..................................................30

IX.    ARGUMENT............................................................................32

      A.    The District Court Erroneously Dismissed on Falsity Grounds
           by (1) Overlooking the Context in Which Defendants Spoke,
           (2) Failing to Draw Reasonable Inferences in Plaintiff's Favor,
           and (3) Applying an Inappropriately Heightened Legal Standard......32

            1.    The District Court Overlooked Critical Context for
                  Defendants' False Statements ....................................................34

            2.    The District Court Acknowledged that Falsity Was Pled
                  Viewing Facts in the Light Most Favorable to Plaintiff,
                  but Then Erroneously Drew Inferences in Defendants'
                  Favor Instead..............................................................................39

            3.    Contrary to *Matrixx*, the District Court Inappropriately
                  Raised the Standard from Misleading to "Necessarily
                  Misleading" ................................................................................44

      B.    The District Court Reversibly Erred in Absolving Defendants
           of a Duty to Correct Their Statements to the Market that
           Misleadingly Created the False Impression that Yahoo Still
           Owned Alipay – When It Did Not .....................................................47

            1.    Although the District Court Held that Defendants'
                  February 16, 2011 Statements Did Trigger a Duty to
                  Correct, the Court Erroneously Allowed Defendants to
                  Continue to Conceal the Truth While They Explored
                  "Avenues of Response" – When There Was No Doubt
                  About the Facts that Had Occurred...........................................50

**Page**

2.  Defendants' False Pre-Class Period Statements Were Far More than Vague Statements of Optimism, Particularly in Light of the Impression Defendants Had Deliberately Cultivated in the Marketplace ....................................................52

3.  The Court Erroneously Excused Defendants from Correcting False Statements by Holding Defendants' Failure to Specifically Mention "Alipay" Was Dispositive – Despite Having Earlier Held "the Definitive Issue Is Not the Use of the Word 'Alipay'" ............54

C.  The District Court Reversibly Erred in Entering Judgment Without Even Addressing Plaintiff's Leave to Amend Request, Particularly Where the Complaint Alleges Adoptive Admissions that Support Both Falsity and Scienter............................56

1.  An Adoptive Admission May Be Manifested by Silence or Equivocation and Is Relevant to Allege Both Scienter and Falsity ................................................................57

2.  Plaintiff Can Amend to Expressly Articulate Its Adoptive Admission Argument ................................................59

D.  The District Court Also Erroneously Dismissed the Control Person Claim ......................................................60

X.  CONCLUSION.............................................................61

772932_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Barrie v. Intervoice-Brite, Inc.*,
409 F.3d 653 (5th Cir. 2005) ........................................................33, 55

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).........................................................................39, 45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................42

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................... *passim*

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................... *passim*

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...............................................32, 59, 60

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...............................................31, 51, 52

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ....................................................47, 52

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)........................................................47, 52

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .........................................34, 35, 37, 38

*In re IBM Corporate Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) ......................................................47, 52

*In re LDK Solar Sec. Litig.*,
No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 80717
(N.D. Cal. Sept. 24, 2008) ..................................................................48

- vi -

**Page**

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ...............................................33

*Matrixx Initiatives, Inc. v. Siracusano*,
    __ U.S. __, 131 S. Ct. 1309 (2011)...................................31, 39, 45, 48

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ..............................................................35

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ................................................ *passim*

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) .........................................................40

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..............................................34, 35, 36

*Sawant v. Ramsey*,
    No. 307-cv-980 (VLB), 2010 U.S. Dist. LEXIS 102899
    (D. Conn. Sept. 28, 2010) ...........................................................49, 50

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ......................................................34, 38

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009), *aff'd*,
    *Matrixx Initiatives, Inc. v. Siracusano*,
    __ U.S. __, 131 S. Ct. 1309 (2011).................................................31, 46

*Stransky v. Cummins Engine Co.*,
    51 F.3d 1329 (7th Cir. 1995) ......................................................47, 52

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................30, 36

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).......................................................................31, 46

**Page**

*United States v. Giese*,
  597 F.2d 1170 (9th Cir. 1979) ............................................................58

*United States v. Henke*,
  222 F.3d 633 (9th Cir. 2000) ......................................................32, 58

*United States v. Moore*,
  522 F.2d 1068 (9th Cir. 1975) ............................................................57

*United States v. Schaff*,
  948 F.2d 501 (9th Cir. 1991) ..............................................................58

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ...................................................... *passim*

*Whitney v. Guys, Inc.*,
  No. 11-3050, 2012 U.S. App. LEXIS 22760
  (8th Cir. Nov. 6, 2012)........................................................................43

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ...............................................................46

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................30, 40, 51, 60

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78aa ....................................................................................................2
  §78j(b)........................................................................................ *passim*
  §78t(a) ..............................................................................2, 3, 29, 60

28 U.S.C.
  §1291....................................................................................................3
  §1331....................................................................................................2

**Page**

Federal Rules of Civil Procedure
    Rule 12(b)(6) .................................................................................30, 39
    Rule 15 ...................................................................................................59

Federal Rules of Evidence
    Rule 801(d)(2)(B) ................................................................................58

17 C.F.R.
    §240.10b-5 ....................................................................................2, 39, 45

## I.   INTRODUCTION

This appeal centers on Yahoo! Inc.'s hopes to make a significant "play" in the Chinese eCommerce market and the failure of Yahoo's officers during the three-month Class Period (April 19, 2011 – July 29, 2011) – former Chief Executive Officer ("CEO") Carol A. Bartz, her predecessor, Jerry Yang, and former Chief Financial Officer ("CFO") Timothy R. Morse – to communicate material negative facts to investors when the play did not work as they had hoped.

Defendants trumpeted the possibilities of getting in on the ground floor of eCommerce in China to investors before and during the Class Period.  In October 2005, Yahoo acquired a significant stake in a Chinese holding company – Alibaba Group Holdings Limited – that was valuable in large part because it owned two private companies, Taobao (similar to eBay) and Alipay (similar to PayPal).  Analysts estimated that Alipay was worth $5-$6 billion.

But, China was restrictive about foreign ownership of Chinese commercial enterprises – a fact defendants had long known.  In June 2009, the Alibaba Group's board – of which defendant Yang was a member – transferred 70% of Alipay's shares to a different Chinese entity.  The Alibaba Group transferred the remaining 30% on August 6, 2010, leaving the Alibaba Group – and therefore Yahoo, its 40% stakeholder – with no shares of Alipay.  On January 27, 2011, the Alibaba Group

terminated the remaining agreement that had held the promise of some *de facto* control over Alipay.

The Alibaba Group received only $46 million for the $5-$6 billion asset.

Despite speaking repeatedly about the value of the Alibaba Group generally and Alipay specifically both before and during the Class Period, defendants never acknowledged the share transfer or the loss of control until May 10, 2011. Even then, defendants concealed facts about when they knew about the loss of shares and control – and how little compensation Yahoo received in exchange. Some facts were eventually revealed on May 12, 2011 – but the full details were not revealed until July 29, 2011.

As the truth was revealed through the partial disclosures, Yahoo's stock price dropped by 30%. Thus, while defendants concealed what they knew about the extent of Yahoo's loss, investors lost hundreds of millions of dollars.

## II.   JURISDICTION

This is an appeal from dismissal of a securities fraud class action alleging defendants Yahoo and its chief officers violated §§10(b) and 20(a) of the Securities Exchange Act of 1934, and Securities and Exchange Commission ("SEC") Rule 10b-5. 15 U.S.C. §§78j(b), 78t(a); 17 C.F.R. §240.10b-5. The district court had federal question jurisdiction. 15 U.S.C. §78aa; 28 U.S.C. §1331. The court dismissed the Consolidated Amended Complaint for Violations of the Federal Securities Laws

- 2 -

("Complaint") and entered final judgment. (ER1-33, 99) Lead plaintiff Pension Trust Fund for Operating Engineers ("Pension Fund") timely filed notice of appeal. (ER100-104) This Court has jurisdiction to review a final judgment. 28 U.S.C. §1291.

## III. ISSUES PRESENTED

1. Did the district court erroneously dismiss plaintiff's falsity claim by (a) overlooking the context in which defendants spoke; (b) failing to draw reasonable inferences in plaintiff's favor; and (c) applying an inappropriately heightened legal standard?

2. Did the district court erroneously dismiss plaintiff's claim that defendants had a duty to correct their prior statements that they admit they knew were false when made?

3. Did the district court erroneously deny leave to amend without a single word of explanation, particularly where the facts alleged support strong adoptive admissions of both falsity and scienter?

4. Did the district court erroneously dismiss the §20(a) claim by erroneously dismissing the underlying §10(b) claim?

- 3 -

## IV.   STATEMENT OF THE CASE

### A.    Nature of the Case

This is an appeal from a judgment dismissing a class action complaint brought by lead plaintiff Pension Fund against Yahoo and its chief officers.  (ER99)  Investors sued after discovering that defendants transferred all shares in and control of a $5-$6 billion asset for only $46 million – and concealed those facts from investors through the Class Period.

### B.    Course of Proceedings; Disposition

Vince Bonato filed his initial complaint against Yahoo, its former CEO Bartz, and her predecessor, Yang, on June 6, 2011.  (Docket "Doc." 1)  On October 12, 2011, the district court granted Pension Fund's motion for lead plaintiff and accepted its selection of lead counsel.  (Doc. 65)

Pension Fund filed the operative Complaint on December 15, 2011, adding CFO Morse as a defendant.  (ER34-98)  Defendants moved to dismiss the Complaint on January 27, 2012.  (Doc. 71)

Following further briefing (Docs. 77, 80) and a hearing (Doc. 86), the district court dismissed the case with prejudice (ER1-33) and entered judgment on September 11, 2012.  (ER99)  Pension Fund timely filed notice of appeal on September 18, 2012.  (ER100-104)

## V.     STATEMENT OF FACTS

### A.     Prior to the Class Period, Defendants Cultivated and Nurtured a Market Understanding that Its Investment in the Alibaba Group – China's E-Commerce Leader – Was Enormously and Increasingly Valuable

In October 2005, Yahoo acquired 46% of Alibaba Group Holdings Limited in exchange for Yahoo China and $1 billion.  (ER48¶35)  The Alibaba Group is a holding company for various e-commerce entities.  (ER48-49¶36)  The other investors in the Alibaba Group were Softbank (approximately 30%) and Jack Ma (approximately 25%).  (ER48¶35)

During the Class Period, the Alibaba Group owned 70% of Alibaba.com and 100% of Taobao (similar to eBay) and Alipay (similar to PayPal).  (ER48-49¶36)



(*Id.*)

From the very date of Yahoo's acquisition of a substantial share of the Alibaba Group, defendants began touting its unlimited possibilities.  (ER47-48¶34)  In the

- 5 -

October 24, 2005 press release announcing the deal, defendants called it a "strategic partnership," creating "the only Internet company in China with a leading position in key growth sectors including business-to-business e-commerce, consumer e-commerce, online payment, communications and search."  (*Id.*)

In Yahoo's 2005 Annual Report, defendants listed the Alibaba acquisition as one of the year's highlights:

> The combination of our China based businesses with Alibaba has created one of the largest Internet companies in China that we believe is well positioned to provide services to China's local emerging and fast growing Internet market.

(ER50¶40)

1.      **The Alibaba Group's Most Valuable Assets Were Its Privately Held Companies – Alipay (Similar to PayPal) and Taobao (Similar to eBay) – Which Defendants Assured Investors Held "Significant Additional Value"**

The gems of Yahoo's investment in the Alibaba Group were the private entities, Alipay and Taobao.  On October 21, 2008, defendants told investors about the market value of Alibaba.com and other investments, emphasizing that the figures did "not include estimates of the value of the Alibaba Group's other privately held businesses such as Taobao and Alipay, which we believe provides significant additional value." (ER51-52¶43)

Defendants had made a nearly identical statement on April 22, 2008 – and made similar statements again on January 27, 2009, October 20, 2009, and October 28,

- 6 -

2009. (*Id.*) Defendants Yang, Bartz, and Morse were each present for at least one of the statements. (*Id.*)

>  **2.  Yahoo CFO Morse and CEO Bartz Explicitly Raved to Investors About the Alibaba Group's "Significant Source of Long-Term Value," Bringing "Dollars into Our Coffers Every Quarter" with Anticipated "Enormous Explosive Growth" – While Reassuring Investors that Defendants Had No Plans "to Liquidate, Spin-Off or Otherwise Dispose of" the Alibaba Group Assets**

On April 22, 2008, defendant Yang described the Alibaba investment as "second to none" and "so unique it won't be able to be recreated."  (ER53-54¶48) Defendant Morse was even more emphatic, describing the Alibaba assets as "our play" in China:

> I personally think and Yahoo thinks this is something, this is our play. This is how we play in China.  Those guys are going to continue to do well.  We have a ton of confidence in them and I believe, we believe these assets will be worth a whole lot more in the coming years than they are now.

(ER54¶49)

On October 20, 2009, defendant Morse was even more specific.  After giving the value of Yahoo's investment in Yahoo Japan and Alibaba.com, Morse reiterated that the figures "do not include estimates of the value of Alibaba group[']s privately-held businesses" – and then added, "We don't have plans to liquidate, spin-off or otherwise dispose of either of these holdings.  They represent a significant source of long-term value for the Company . . . ."  (ER51-52¶43)

- 7 -

Further addressing the value of the Alibaba Group and Yahoo Japan, defendant Morse touted that "they're market leaders." (*Id.*) "They're great at what they do. They have tremendous upside to them. . . . We think they're terrific assets that are going to be worth a whole lot more in the future than they are today." (*Id.*)

Even apart from the glowing promises about future performance, Morse told investors that Yahoo had "terrific agreements with [Alibaba Group and Yahoo Japan] that actually bring dollars into our coffers every quarter." (*Id.*) Morse touted the investments as money in the bank.

Morse made similar statements on April 20, 2010. Speaking to analysts about the "China assets," he explained, "we see those as a terrific, terrific investment that are become – more and more valuable over time. It's a great way to play the Chinese market . . . . We think that will be worth much more again, as we go forward here." (ER55¶52)

The prior month, on March 3, 2010, defendant Bartz told investors she was "glad we are invested in the Internet in China through Alibaba, because that allows us to ride the enormous – what we all know will be an enormous explosive growth in the Internet and the whole use of the Internet, whether it's shopping and information and advertising and so forth." (ER55¶51)

On June 24, 2010, Bartz specifically explained that the Alibaba investment was a "great investment" with "spectacular returns," but "not liquid" yet. (ER56¶54)

"[W]e are very aware that a great amount of our value for the shareholders beyond our cash and beyond Yahoo!, Inc., the US company, is Alibaba and Japan." (*Id.*) "[R]ight now it is a privately held, not liquid investment." (*Id.*)

Bartz assured investors, however, that liquidity of this valuable investment was coming. "There will certainly come a day that we will be able to unlock that Alibaba investment as they start spinning up public companies, perhaps like Taobao and those kind of companies I'm sure you've read about." (*Id.*) "[I]t's not as liquid as you would like it to be, but it will be." (*Id.*)

### 3. Analysts Echoed Defendants' Enthusiasm, Calling Yahoo's 40% Stake in the Alibaba Group's "Still-Private Holdings" – Alipay and Taobao – "Yahoo's Most Valuable Asset"

Analyst comments during the Class Period reflected that the market understood the most valuable parts of the investment were Alipay and Taobao. (ER52-53¶45) One analyst explained, "We believe that Yahoo's most valuable asset is its 40% stake in Alibaba Group's still-private holdings, which are separate and distinct from its ownership in the publicly-traded Alibaba.com, which we are essentially getting for free." (*Id.*) The same analyst wrote that "[w]e would not be surprised if [Yahoo's] 40% stake in Alibaba Group alone was ultimately worth [Yahoo's] entire current market value." (*Id.*)

- 9 -

772932_1

As of May 13, 2011, Credit Suisse analyst Spencer Wang estimated Alipay's market value at $6 billion.  (ER53¶46 (chart))  Another analyst valued it at $5 billion.  (ER53¶47)  On the same day, the *Financial Times* reported that analysts estimated Yahoo's (former) 44% stake in Alipay was worth about $3 billion.  (*Id.*)

### 4. Yahoo Co-Founder, Officer, and Director Jerry Yang Served on the Alibaba Group Board – a Fact that Defendants Claimed Allowed Them to Be "Always Evaluating" the Alibaba Investment

On October 20, 2010, defendant Bartz stated in an interview on Fox News that Yahoo was "always evaluating" the Alibaba Group investment through defendant Yang's position on the Alibaba Group board and the Company's "team of very strong financial experts."  (ER53-54¶48)  Yang was a co-founder, former CEO, and director of Yahoo, known as "Chief Yahoo."  (ER46¶30)  Earlier in the year, Bartz had reassured investors that "we have a good relationship with Alibaba as we've said.  We have an investment in Alibaba, Jerry sits on their board.  And really that is[] all there is to it."  (ER54-55¶50)

Actually, there was more.  Yahoo had a dedicated compliance officer at the Alibaba Group.  (ER68¶92)  Further, §3.1 of the October 24, 2005 Shareholders Agreement between Alibaba.com, Yahoo, Softbank, Alibaba Group management and other shareholders of Alibaba.com required a majority of the Alibaba Group board – including Yang – to approve any transaction involving the disposition, sale, or other

transfer of the assets of the Alibaba Group if the transaction exceeded $10 million. (ER67-68¶91)

Moreover, §8.5(b)(iv) of the Shareholders Agreement required Alibaba to send Yahoo a monthly management report, including financial statements and subsidiaries. (ER68¶93)  After the Alipay transfer, the most reasonable inference is that Alipay would no longer be listed as a subsidiary – a fact that would have been included in the report sent to Yahoo.  (*Id.*)

Even further, §8.5(b)(iii) required Alibaba to send Yahoo a quarterly report that included "explanations for any significant movements from the prior quarter" in Alibaba's financial statements.  (*Id.*)  Again, the most reasonable inference is that the Alipay transfer information would have been included in this explanation.

**B.     Defendants Admitted They Knew for Years Before the Class Period that Yahoo's Foreign Ownership of the Chinese Companies Was Potentially Untenable – and Admitted "Following Developments" When China Made Foreign Ownership Effectively Impossible in June 2010**

Defendants were aware long before the Class Period or the transfer of Alipay that their foreign ownership of the Chinese companies was an issue.  As defendant Yang admitted on May 25, 2011, "[t]he Alibaba board, including Yahoo! and Softbank, have been following developments in this evolving licensing environment for the last few years."  (ER57¶56)  Yang further explained to investors that "Internet businesses are generally licensed through entities held by Chinese nationals that holds

- 11 -

the license." (*Id.*) Thus, according to defendants themselves, they had been paying attention to issues regarding foreign ownership of internet companies in China since at least 2008 or 2009. (*Id.*)

Defendants were "following developments" in June 2010 when the People's Bank of China adopted new regulations making foreign ownership of any company providing "payment services" significantly more complicated. (ER58¶58) The new regulations required foreign-owned companies to follow special rules, including obtaining State Council approval – which Alibaba Group CEO Ma and Alipay CFO Jing Xiandong both believed would take too long and could result in the destruction of Alipay. (ER58¶59)

Indeed, defendants would not have needed to work hard to follow those developments. On June 23, 2010, the *Financial Times* reported that Bank of China's new regulations "explicitly excluded companies with foreign capital from the new regulatory framework," which created a problem "for everyone with a shred of a foreign investment." The *Financial Times* even specifically reported that "virtually all players that matter in the Chinese market will have to restructure their shareholding[s]," that the new regulations "could force leading Chinese internet companies including Tencent and Alibaba to restructure their shareholdings," and that "it is understood that Alibaba's management is considering hiving Alipay off." (ER58-59¶60)

- 12 -

**C.      On August 6, 2010, the Alibaba Group Transferred All of
Its Alipay Shares – Valued at $5-$6 Billion – to a Chinese
Company Run by Jack Ma for Only $46 Million – and,
Within Six Months, Gave Up All Control of Alipay**

The Alibaba Group began transferring Alipay over a year before the Bank of

China adopted the new regulations.  In June 2009, the Alibaba Group's board – of

which defendant and Yahoo director Yang was a member – had already transferred

70% of Alipay's shares to Zhejiang Alibaba E-commerce Company Ltd. ("Zhejiang"),

a Chinese company majority owned by Ma, the CEO of the Alibaba Group.  (ER37-

38¶3; ER61¶70)   At  a  press  conference  and  subsequent  interview  with  *China*

*Entrepreneur Magazine* on June 14, 2011, Ma said that the board approved the June

2009 transfer and that the approval was recorded in the minutes of the July 24, 2009

board meeting.  (ER61¶70)

A year later, on August 6, 2010, the Alibaba Group transferred the remaining

30% of Alipay shares to Zhejiang for $23.6 million.  (ER59¶62)  Eventually, *Caixin*

*Online* reported that the total consideration given for all 100% of the Alipay shares

had been $46 million.  (*Id.*)

**1.      The "Sale" Translated to a Loss of 99% of Alipay's
Value for Investors – but Initially Left the Alibaba
Group with Control of Alipay**

The Alibaba Group transferred 100% of its shares in Alipay for $46 million

when Alipay was valued at $5-$6 billion.  (ER53¶46 (chart); ER59¶62)  In other

- 13 -

words, the Alibaba Group gave up all of its shares in Alipay – the Chinese PayPal – for less than 1% of its estimated value.

Even with Alipay's formal ownership by a Chinese national, however, the Alibaba Group initially still had control of Alipay after the August 6, 2010 transfer because of its "variable interest entity" ("VIE") arrangement with Zhejiang. (ER60¶64)  As the district court explained, to respond to regulations that Chinese internet businesses be owned by Chinese nationals, "[i]nternet businesses with non-Chinese investors are often formally owned by Chinese nationals, but are structured with contractual agreements that give control and economic benefits to the non-Chinese investors."  (ER4)  "With a VIE structure, the non-Chinese investors can become the primary beneficiaries of the VIE's revenues, earnings, and profits, and consolidate the VIE's financial results with their own."  (*Id.*)

### 2. On January 27, 2011, the Alibaba Group Terminated Its Foreign Ownership Agreement with Yahoo, Meaning that Yahoo No Longer Had Any Control Over Alipay

Because of the Alibaba Group's VIE arrangement with Zhejiang, the Alibaba Group – and, therefore, Yahoo – still had some control of Alipay after the August 6, 2010 Alipay share transfer.  (ER39¶9)  The VIE arrangement gave the Alibaba Group *de facto* control of Zhejiang – to whom Alipay had been sold.  (*Id.*)

- 14 -

On January 27, 2011, the Alibaba Group terminated the VIE arrangement between Zhejiang and the Alibaba Group.  (*Id.*)

**D.     Defendants Concealed the Massive Loss from Investors for Nine Months – Including Six Weeks After Defendants Admit They Knew About the Loss**

**1.     After the August 6, 2010 Transfer of 100% of Alipay's Stock, Defendants Continued to Speak as Though Alipay Was Still a Source of Value to Yahoo**

Three days after the August 6, 2010 transfer of the last of the Alipay stock from the Alibaba Group to Zhejiang, Yahoo published its Form 10-Q financial report for the second quarter of 2010.  (ER70-71¶99)  The report included a separate section on Yahoo's "Equity Investment in Alibaba Group," but never mentioned the loss of Alipay.  (ER70-72¶¶99-102)

On October 19, 2010, Yahoo reported its financial results for the third quarter of 2010.  (ER72¶103)  Defendants touted "solid results" from their "important investment" in the Alibaba Group, including a "roughly $10 billion" pretax value for Alibaba.com.  (ER72-73¶¶104-105)  Tantalizingly, Morse added that the valuation did "not include estimates of the value of Alibaba Group's privately held businesses." (ER72-73¶104)  Bartz echoed, "We know there's tremendous value in the businesses they're growing."  (ER73¶105)

The next day, defendant Bartz was even more specific.  In a Fox News interview on October 20, 2010, Bartz gloated that "everybody is salivating because it

- 15 -

[is] . . . such a good investment." (ER73-74¶106) The journalist followed up, asking Bartz about "Alibaba, this Chinese site in which you have a near 40 percent stake that is extraordinarily valuable." (*Id.*) The journalist asked if it was worth "7 billion," "11 billion," explaining "I can't get a straight number from anybody." (*Id.*) Bartz responded, "I think one of the reasons you can't get a straight number is it's a private company . . . ." (*Id.*)

Alipay and Taobao were private. (ER51-52¶43) Alibaba.com was public. (*Id.*) Thus, in response to a question about the extraordinary value of Alibaba in October 2010, defendant Bartz referenced the private company – but failed to mention that Yahoo no longer owned any shares of Alipay. (ER73-74¶106)

On January 25, 2011, defendant Morse was explicit. (ER75¶109) In a conference call regarding Yahoo's 2010 fourth quarter and year-end results, Morse gave valuations for Alibaba.com, adding, "These figures . . . do not include estimates of the value of Alibaba Group's privately held businesses, most notably Taobao and Alipay." (*Id.*) Bartz listened. (*Id.*) But, Yahoo no longer owned Alipay.

Moreover, Bartz specifically enthused about the value of both Alibaba.com and Taobao – also never mentioning that Alipay was no longer in the mix:

> For Alibaba, I think I can sum up our point of view quite simply. Our approximately 40% stake has been and continues to be a great investment. And we believe it has a bright future. Alibaba.com is growing quickly, as is Taobao, which is now China's biggest online commerce marketplace with an estimated 75% share of the market. With

- 16 -

> eCommerce exploding in the largest country in the world, we feel our investment in Alibaba will grow in value and continue to greatly benefit our investors over time.

(*Id.*)  Bartz gave the good news – Alibaba.com and Taobao growing quickly, "eCommerce exploding" – but left out the bad news – Yahoo no longer owned any Alipay shares.  (*Id.*)

On February 16, 2011, defendant Morse again mentioned Alipay by name, as though Yahoo still had a stake in it or any control over it.  (ER77¶116)  Asked about profitability, Morse responded "[w]e're much more interested in the long term value creation here."  (*Id.*)  Morse explained that Alibaba Group's CEO (Ma) and CFO (Tsai) were running the companies well:

> I think the strategy that they're pursuing with regard to Taobao, with regard to Alipay, fantastic.

(*Id.*)  Yet again, Morse failed to mention that Yahoo no longer owned or controlled any part of Alipay.  (ER78¶118)

Morse followed up, continuing to emphasize that "our view of Alibaba is it's an investment."  (ER77-78¶117)  Again, he assured investors "[i]t will be worth a lot more" and value would be "maximized" "once it goes public."  (*Id.*)

Defendants repeatedly concealed that the Alibaba Group – and, therefore, Yahoo – no longer owned any shares of Alipay and no longer had any control of Alipay because the VIE arrangement had been terminated.  (ER77-78¶¶117-118)

- 17 -

**2. On April 19, 2011, Defendants Spoke to Investors About the Alibaba Group Private Businesses, Misleading Investors to Believe that Yahoo Still Owned Its Valuable Asset**

On April 19, 2011, defendants announced Yahoo's financial results for the first quarter of 2011. (ER78-79¶119) As had become his practice, defendant Morse dangled a carrot for investors, explaining that the Alibaba valuations "do not include estimates of the value of Alibaba's privately held businesses." (*Id.*)

Morse failed to say anything about the fact that Yahoo no longer owned any shares in Alipay. (*Id.*) He failed to say anything about the fact that Yahoo no longer had any control of Alipay through a VIE arrangement. (*Id.*) As discussed in the next section, defendants admit they already knew both facts by the time Morse spoke on April 19, 2011. (ER60¶¶65-66)

Though present, defendant Bartz said nothing to correct Morse's misleading statement. (ER78-79¶119)

**3. On May 10, 2011, Defendants Continued to Mislead Investors About the Value of Yahoo's Alibaba Group Investment**

On May 10, 2011, defendants finally publicly disclosed that Alipay was "restructured so that 100 percent of its outstanding shares are held by a Chinese domestic company which is majority owned by Alibaba Group's chief executive officer." (ER60¶65; ER79¶122) Defendants added that "Alibaba Group's management and its principal shareholders, Yahoo! and Softbank Corporation, are

- 18 -

engaged in ongoing discussions regarding the terms of the restructuring and the appropriate commercial arrangements related to the online payment business." (*Id.*)

Defendants concealed that the sale had occurred more than nine months earlier. (ER80¶123)  Defendants said nothing about when they learned of the sale – nor the fact that the "sale" was for less than 1% of the estimated value of Alipay.  (ER79-80¶¶122-123)  Moreover, defendants continued to conceal that Yahoo no longer had any control whatsoever over Alipay because the VIE arrangement had been terminated in January 2011.  (*Id.*)

Even this limited news caused a market response.  (ER87-88¶144)  Yahoo's stock price dropped 7.3% from $18.55 on May 10, 2011 to $17.20 on May 11, 2011. (*Id.*)

On May 12, 2011, Alipay issued a press release reporting that Alipay was restructured in 2010.  (ER60¶67)  Perhaps not coincidentally, defendants belatedly admitted this information on the same day.  (ER60¶66)  Defendants explained the Alibaba Group's Alipay shares had been transferred in August 2010 – and "the deconsolidation of Alipay" became "effective in the first quarter of 2011."  (*Id.*)

In Yahoo's May 12, 2011 press release, defendants claimed they were only "notified by Alibaba Group" about these "two transactions" on "March 31, 2011." (*Id.*)  The press release also claimed the transactions "occurred without the knowledge or approval of the Alibaba Group board of directors or shareholders."  (*Id.*)

- 19 -

Defendants continued to conceal that they had sold a $5-$6 billion asset for only $46 million. Even without knowing that, the market responded swiftly. Yahoo's stock price declined another 3.6% from $17.17 on May 12, 2011 to $16.55 on May 13, 2011. (ER88¶145)

Analysts were incredulous. The same day as defendants' press release claiming the transactions occurred "without the knowledge or approval of the Alibaba Group board" (ER60¶66) analysts wrote, "the optics [were] bad," it seemed that defendants were "hiding this piece of news," and analysts were surprised it had not been disclosed earlier. (ER65¶82)

Even more pointedly, the following day, one analyst asked, "How can Alipay, owned by Alibaba Group, be 'transferred' without knowledge of Alibaba Group's Board?" (ER65-66¶83) The same analyst noted that "[t]his 'asset transfer' took place right after an order released by the People's Bank of China requiring non-bank payment companies to obtain a regulatory license (which involves 100% Chinese ownership)." (*Id.*)

On May 20, 2011, another analyst wrote that analysts were "still troubled by the differing claims made by Alibaba Group and Yahoo as to who did and knew what when pertaining to Alibaba's 'deconsolidation' of Alipay." (ER66¶84)

Defendants never did admit to investors that they had transferred 100% of the Alipay shares and all control for only $46 million. But, eventually, on May 13, 2011,

- 20 -

*Caixin Online* reported that the consideration received by the Alibaba Group for the share transfer to Zhejiang was 330 million yuan or approximately $46 million. (ER59¶62)

      **E.    Contemporaneous Reports by Others Involved in the Transactions Strongly Suggest that Defendants Knew About the Stock and Control Agreement Transfers in August 2010 and January 2011, When They Occurred**

          **1.    The Alibaba Group Board – of Which Yahoo Co-Founder and Director Jerry Yang Was a Member – Immediately Publicly Corrected Yahoo's Statements, Explaining the Board Knew in July 2009 that a Majority of Alipay's Shares Had Been Transferred into Chinese Ownership**

On May 13, 2011, the very day after defendants and Alipay issued their same-day press releases, admitting the stock transfer occurred in August 2010 and the ownership change in January 2011, the Alibaba Group publicly responded. (ER61¶68)  While Yahoo's press release had stated that the transactions "occurred without the knowledge or approval of the Alibaba Group board of directors or shareholders" (ER60¶66) and that Yahoo was not notified until March 31, 2011 (*id.*), the Alibaba Group made clear that the decision to transfer ownership was announced at a July 2009 Alibaba Group board meeting:

> The Alibaba Group board discussed at numerous board meetings over the past three years the impending imposition of new regulatory requirements on the online payment industry, including ownership structures, as they were being developed in China, and was told in a July 2009 board meeting that majority shareholding in Alipay had been transferred into Chinese ownership.

- 21 -

(ER61¶68)

Thus, the Alibaba Group reported that the "impending imposition of new regulatory requirements on the online payment industry" was "discussed at numerous board meetings" between 2008 and 2011. (*Id.*) Defendant Yang, himself, admitted that "[t]he Alibaba board, including Yahoo! and Softbank, have been following developments in this evolving licensing environment for the last few years." (ER57¶56) The most reasonable inference from those facts is that defendants knew that the Bank of China adopted new regulations in June 2010, making it necessary and extremely difficult for foreign companies to obtain a license to operate an online payment company.

> **2.  In June 2011, Alibaba Group CEO Jack Ma Publicly Stated Defendants Knew About the Stock Transfer and Termination of the Control Agreements When They Happened – in August 2010 and January 2011**

In a June 1, 2011 interview, Alibaba Group CEO Ma made the board's point even more sharply, saying "It's impossible that the board doesn't know what was going on." (ER61¶69) In a subsequent interview two weeks later, Ma reiterated that the Alibaba Group's board transferred the first 70% of Alipay's shares to Zhejiang in June 2009 – and that the transfer was reflected in the minutes of the July 24, 2009 board meeting. (ER61¶70)

- 22 -

Ma further said that while the board did not specifically approve or disapprove decisions, the board did discuss issues and "come to an agreement." (ER61-62¶71) "It's all decided in the minutes of our meetings." (*Id.*) When directly asked on June 14, 2011 if Yahoo was "lying" about not knowing about the transfer of all remaining shares on August 6, 2010 when it happened, Ma pointedly responded:

> What do you think? Every time we have a board meeting there are minutes taken. . . . Why Yahoo only revealed the Alipay transfer in May, I don't know that either.

(ER62¶73)

Ma also made clear that the Alibaba Group board knew about the January 2011 ownership change when it happened. (ER62-65¶¶75-81) Ma received two letters from Bank of China, asking about foreign ownership and VIE arrangements. (ER62-63¶75) Ma's evaluation, as CEO of the Alibaba Group, was that the VIE arrangements had to be terminated in order for Alipay to get licensing approval. (*Id.*) Ma terminated the VIE. (ER64¶80)

Ma stated the board was "one-hundred percent aware" of the decision. (ER62-63¶75) He said he personally told Yang the day after he terminated the VIE agreements. (ER64-65¶81) He also said "[o]n the second day after the license application of Alipay [which was deemed to have required termination of the VIE], we reported it to the board." (*Id.*)

- 23 -

**3.  Defendants Admit that They Knew About the Changed Value and Ownership by at Least March 31, 2011 – but Still Never Corrected the False-When-Made Statements They Had Been Making Since the August 6, 2010 Transfer**

As discussed above, even defendants admit they knew about the sale of 100% of Alipay shares (transfer of ownership) and the "deconsolidation" (transfer of control) by March 31, 2011.  (ER60¶¶65-66)  Thus, even if the Complaint allegations and reasonable inferences were (erroneously) construed in the light most favoring defendants, defendants concealed facts regarding the transfers from investors between March 31, 2011 and May 12, 2011 – and failed to correct false statements they had made since August 6, 2010.

**F.  From May 13, 2011 to July 28, 2011, Defendants Not Only Never Denied Direct Accusations that They Knew About the Alipay Transfers When They Happened – but Also Created an Expectation that They Were Negotiating a Fair Resolution for Investors**

Defendants were mysteriously cryptic.  They refused to answer investors' direct questions about details of the Alipay transfer, but created a market expectation that the Alipay sale price would be renegotiated so shareholders would be "fairly compensated."  (ER67-68¶91)

Following some self-imposed directive of silence, defendants refused to meaningfully respond to analyst and investor questions regarding the timing of when they knew and why they waited so long to disclose the Alipay share and control

- 24 -

transfers. For example, after the Alibaba Group issued a press release on May 13, 2011 – directly contradicting defendants' May 12, 2011 press release claiming defendants did not know anything about the transfers until March 31, 2011 – defendants said nothing. Despite the Alibaba Group's immediate public rebuke about when its board knew about the transfers, defendants had no response.

In the vacuum, *Caixin Online* dropped the other shoe, reporting the absurd sale price. (ER59¶62) On May 13, 2011, the Chinese online publication reported that 100% of the shares – and full control – had been transferred for only $46 million. (*Id.*)

The market noticed both defendants' silence and the absurd 1% sale price for Alipay. Yahoo's stock price dropped another 4.5% from $16.55, on Friday, May 13, 2011, to $15.81 on Monday, May 16, 2011. (ER88¶¶145-146)

At an investor event on May 25, 2011, defendant Bartz ducked questions about the disclosure timing, saying "simply put, very simply put, we believe our disclosure was timely and appropriate. As you can imagine, we're not going to be able to say more about this topic." (ER66¶86)

Defendant Yang was similarly evasive at the same event, but suggested there was a solution in the works for investors:

> [W]e're not going to talk about any specific timing of when we could have done this or not but, clearly, we have to solve both things. We have to get a license for the business, and we have to get an economic

- 25 -

arrangement that satisfies that licensing requirement, and you can imagine it's not straightforward.

(ER67¶88)  When pressed for more information, defendant Bartz made the stonewall explicit:

> Of course, you know, I love to answer questions.  Then so my husband says, I'll answer anything, even if I don't know anything about it.  But listen.  We have agreed sincerely with Softbank and with Alibaba Group that none of us were going to discuss the past, and I am upholding our word.

(ER67¶89)

Another questioner at the same investor conference specifically asked how the deal could have happened without the Alibaba Group board's approval in light of Shareholder Agreement §3.1, which required the board's approval for any transaction exceeding $10 million.  (ER67-68¶91)  Alibaba Group board member Yang would only say, "Alipay has to get licensed, and Alibaba Group has to be fairly compensated."  (*Id.*)  Underscoring the fact that defendants were not answering investors' questions, Bartz repeated, "we have an agreement with Softbank and Alibaba that we're not going to talk about the past."  (*Id.*)

Even after Ma spoke openly about details of the Alipay transfer on June 14, 2011, stating that defendant Yang knew about the transfer when it happened (ER61¶69; ER64-65¶81), defendants still remained silent.  (ER70¶97)  When the *China Entrepreneur Magazine* reporter asked Ma whether defendants were "lying," Ma replied, "What do you think?"  (ER62¶73)  Still, defendants said nothing.  One

- 26 -

week after Ma accused defendants of lying, Yahoo, Softbank and the Alibaba Group issued a joint press release on June 21, 2011, stating "The companies will not comment in further detail until it is appropriate to do so." (ER80-81¶126)

But, defendants did assure investors that a meaningful resolution was in the works. In the same joint press release on June 21, 2011, Yahoo, Softbank and the Alibaba Group told the market that they were "engaged in constructive negotiations" and had "made substantive and encouraging progress toward an agreement regarding Alipay." (ER70¶97) Earlier, on June 12, 2011, Ma had also publicly explained that the $46 million price was only provisional and that "negotiations are still underway." (ER59¶62)

On June 23, 2011, defendant Bartz repeated the self-imposed gag agreement. (ER81¶127) Despite the fact that both Ma and the Alibaba Group had already spoken publicly about when defendants learned about the transfers, Bartz maintained, "we all agreed to not talk publicly about it until it's done, because it's very important." (*Id.*)

Of course, there was nothing to be "done" about when defendants knew about the transfers of shares and of control – or about the amount of money (less than 1% of the estimated value) the Alibaba Group had received in exchange. Instead, defendants left investors with the hope that "Alibaba Group has to be fairly compensated" (ER67-68¶91), and the assurance that "constructive negotiations" were making "substantive and encouraging progress" toward that end. (ER70¶97)

- 27 -

**G.      On July 29, 2011, Defendants Revealed a "Resolution" Well Below the Value of Alipay They Had Conditioned the Market to Expect and the Impact of the Fraud Was Finally Fully Felt**

Finally, on July 29, 2011, defendants revealed the resolution they had negotiated to the problem they created in August 2010 and January 2011. (ER84¶132) According to their announcement, the Alibaba Group would continue to receive a significant portion of Alipay income, Alipay would continue to provide payment services for Taobao on preferential terms, and the Alibaba Group would receive 37.5% of the proceeds of an Alipay initial public offering – subject to a $2 billion floor and a $6 billion ceiling. (*Id.*)

Thus, defendants' "terrific, terrific investment" with "tremendous upside" that was supposed to become "more and more valuable over time" (ER51-52¶43; ER55¶52) was gone. Despite Alipay's estimated $5-$6 billion value (ER53¶¶46-47), what defendants had to show for it was $46 million and the possibility of somewhere between $2-$6 billion at some undetermined future date.

Analysts immediately described Yahoo as a "forced seller." (ER84¶133; ER85¶137) The *Associated Press* reported that the CFOs of Yahoo and the Alibaba Group "did their best to sell the Alipay settlement as [a] good deal for all parties involved, but Wall Street didn't appear to be buying the rationale." (ER85¶136)

The market responded to finally learning the full impact of what defendants had concealed. On May 6, 2011 – before defendants began partially revealing the stock and control transfers – Yahoo's stock price closed at a Class Period high of $18.65. (ER87¶143) After the partial disclosures on May 10 and 12, 2011, and defendants' revelation on July 29, 2011, Yahoo's stock price declined to $13.10. (*Id.*) The July 29, 2011 stock price was 30% lower than the Class Period high of $18.65. (*Id.*)

On September 6, 2011, Yahoo announced that its board had removed Bartz as CEO. (ER85¶138) In January 2012, Yang announced he was resigning from the Yahoo board. (ER8)

## VI.   DISTRICT COURT RULING

The district court held that defendants' Class Period statements were not actionably false because they did not say anything that was literally inaccurate. (ER11-19) Further, the district court held that defendants did have a duty to correct certain pre-Class Period statements once they admittedly knew them to have been false when made, but nonetheless exonerated defendants by ruling that six weeks was a reasonable amount of time to correct their knowingly false statements. (ER20-28, 31-33) The court ruled there was no applicable duty to update. (ER28-31) Having found no underlying §10(b) claim, the court dismissed the §20(a) claim solely on that ground. (ER33)

Without one word of explanation, the court dismissed the Complaint without leave to amend, even though this was plaintiff's initial consolidated complaint.

## VII.  STANDARD OF REVIEW

Dismissals under Rule 12(b)(6) are reviewed *de novo*. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).  Courts must accept "as true" all factual allegations made in the complaint and "construe them in the light most favorable to plaintiffs."  *Id.*; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[1]

Denial of leave to amend is reviewed for abuse of discretion.  *Zucco*, 552 F.3d at 989.

## VIII.  SUMMARY OF ARGUMENT

The district court erred in dismissing falsity.  The court failed to analyze defendants' statements in light of the context that defendants had known the facts supporting falsity for nearly two years by the time they spoke (ER61¶70) and had conditioned the market to believe Alipay held "significant additional value" for investors.  (ER51-52¶43)  That context was critical to the court's falsity analysis. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

---

[1]     Citations and internal footnotes omitted and emphasis added unless otherwise noted.

- 30 -

772932_1

The court further erred by acknowledging that the facts alleged do support falsity when construed in the light most favoring plaintiff, but then choosing to adopt defendants' explanations instead. *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).

Moreover, the court erroneously dismissed plaintiff's falsity claim by inappropriately raising the standard from "misleading" to "necessarily misleading" (ER19), creating a more stringent standard for materiality than this Court or the Supreme Court deem acceptable at the pleading stage. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009), *aff'd*, *Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S. Ct. 1309 (2011); *Matrixx*, 131 S. Ct. at 1318; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

The district court also erred in dismissing plaintiff's duty to correct claim. Despite acknowledging that defendants learned during the Class Period that certain of their earlier statements were false when made, the court erroneously held defendants were reasonable in waiting another six weeks to correct their falsehoods – even though all facts were already known to defendants. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007). The court erred in dismissing defendants' duty to correct other statements by incorrectly characterizing them as mere "expressions of enthusiasm" (ER24) when, in context, defendants were specifically addressing the value of a $6 billion enterprise. *Warshaw v. Xoma Corp.*, 74 F.3d 955,

- 31 -

959 (9th Cir. 1996). The court further erred by dismissing a duty to correct statements that did not specifically include the word "Alipay," despite having previously ruled that defendants need not "utter the magic word" to be liable. (ER15, 17, 26)

The court erroneously entered judgment without even mentioning plaintiff's request for leave to amend – despite the fact that this was the court's first substantive order in the case. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1049 (9th Cir. 2003). The facts alleged support adoptive admissions of falsity and scienter which plaintiff could more clearly articulate if given an opportunity to amend. *United States v. Henke*, 222 F.3d 633, 642 (9th Cir. 2000).

## IX. ARGUMENT

### A. The District Court Erroneously Dismissed on Falsity Grounds by (1) Overlooking the Context in Which Defendants Spoke, (2) Failing to Draw Reasonable Inferences in Plaintiff's Favor, and (3) Applying an Inappropriately Heightened Legal Standard

During the Class Period, defendants made false statements on two dates.

On April 19, 2011, defendant Morse announced Yahoo's financial results for the first quarter of 2011, adding that the Alibaba valuations "do not include estimates of the value of Alibaba's privately held businesses." (ER78-79¶119) Morse materially misled investors by failing to tell them that Yahoo no longer had any ownership or control of Alipay. (*Id.*)

- 32 -

Bartz listened in silence.  (ER79¶120)  Her knowing silence is actionable.
*Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements"); *see also In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000).  The district court legally erred in holding to the contrary. (ER13 ("if Bartz said nothing about the Alibaba Group, there is no duty to disclose. . . ."))

On May 10, 2011, defendants published their Form 10-Q for the first quarter of 2011 and acknowledged that the Alibaba Group had sold all its shares of Alipay to a Chinese company.  (ER60¶65; ER79¶122)  Defendants reported that there were "ongoing discussions regarding the terms of the restructuring and the appropriate commercial arrangements" (*id.*), but continued to conceal the $46 million price. Defendants also concealed that they had terminated the VIE arrangement and no longer had any control over Alipay.  Again, their omissions materially misled investors.

- 33 -

### 1.    The District Court Overlooked Critical Context for Defendants' False Statements

Analyzed in context, defendants' April and May statements were false when made.  But, while the district court recited the contextual facts, it failed to apply them in analyzing falsity.  (ER1-33)

Context is crucial to falsity in this case for two reasons.  First, defendants had known the facts supporting falsity for nearly two years by the time they spoke to the market on April 19, 2011.  (ER61¶70)  The especially strong scienter allegations support the falsity claim.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Second, defendants spoke to a market that they had deliberately conditioned to have a very specific understanding about the value of Alipay.  (ER51-52¶43; ER55¶52)  Their Class Period statements cannot be viewed in isolation, but must be considered in the context of what they had already told the market.

In analyzing falsity, context is always critical.  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010).  Falsity under §10(b) is determined by considering a statement "when taken in context."  *Warshaw*, 74 F.3d at 959; *accord Berson*, 527 F.3d at 987 (in the context of their other statements, defendants were obliged to speak "in a manner that wouldn't mislead investors [on the subject]").

Indeed, context can render even a "literally accurate" statement materially misleading under the securities laws.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d

- 34 -

507, 512 (9th Cir. 1991). "'Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'" *Id.*, quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). "'For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'" *Id.*; *accord Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("a statement that is literally true can be misleading and thus actionable under the securities laws").

Here, context is critical in part because defendants had known the facts supporting falsity for nearly two years by the time they spoke. (ER61¶70) The strength of the scienter facts supports falsity because "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts." *Ronconi*, 253 F.3d at 429. The unitary question for this Court is whether "taken as a whole," the Complaint allegations "raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors." *Id.*

In May 2011, defendant Yang admitted that the Alibaba board – of which he was a member – had been "following developments in this evolving licensing environment for the last few years." (ER57¶56) More specifically, the Alibaba Group published a press release on May 13, 2011, explaining that its board had

- 35 -

discussed "the impending imposition of new regulatory requirements on the online payment industry, including ownership structures, as they were being developed in China" "over the past three years." (ER61¶68)

The Alibaba Group press release directly stated that the Alibaba board – of which Yang was a member – "was told in a July 2009 board meeting that majority shareholding in Alipay had been transferred into Chinese ownership." (*Id.*) The transfer was reflected in the July 24, 2009 board meeting minutes. (ER61¶70)

Indeed, the board had to be told. Yahoo's shareholder agreement with the Alibaba Group and other investors required a majority of the Alibaba Group board to approve any transaction involving the disposition, sale, or other transfer of the assets of the Alibaba Group if the transaction exceeded $10 million. (ER67-68¶91, referencing 10/24/05 Shareholders Agreement §3.1) Other sections of the same agreement required the Alibaba Group to send monthly and quarterly reports to Yahoo that would have included information about a substantial transfer of Alipay shares. (ER68¶93, referencing 10/24/05 Shareholders Agreement §§8.5(b)(iii)-(iv))

This Court must accept those facts "as true" at the pleading stage. *Tellabs*, 551 U.S. at 322; *N.M. State*, 641 F.3d at 1094. Accepted as true, the facts support a reasonable – if not undisputed – inference that defendants had known since June 2009 that Yahoo no longer owned 70% of Alipay.

Defendants' Class Period statements were made nearly two years later, on April 19, 2011 and May 10, 2011.  (ER78-79¶¶119, 122)  By then, defendants also knew that 100% of the Alipay shares were gone and that the VIE arrangement had been terminated.  They had known those facts for nine months and three months, respectively, by the time they spoke in April.  (ER62-65¶¶73-81)

The fact that defendants had known they were losing – and then, had lost – Alipay for nearly two years before they spoke reduces the likelihood that their Class Period statements were off-the-cuff misstatements.  Defendants had had nearly two years to think about the fact that the gem of the Alibaba Group – Alipay – was going and gone.  They had had time to consider what that meant to their investors.

That context matters.  And, the district court never considered it in analyzing the falsity of the April 19, 2011 and May 10, 2011 statements.  (ER1-33)

Context is also critical here because of the information defendants had methodically planted in the market about Alipay's value.  This Court explains that statements must be analyzed in context to assess whether they would mislead investors.  *Berson*, 527 F.3d at 987 ("once defendants chose to tout [the subject], they were bound to do so in a manner that wouldn't mislead investors as to [the subject]"); *accord Convergent*, 948 F.2d at 512 ("to prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading

- 37 -

impression"). Here, when defendants' statements are "read in light of all the information then available to the market," their falsity is even more apparent.

Defendants had carefully and repeatedly conditioned the market to understand that the Alibaba Group was Yahoo's "play" in China. (ER54¶49) More specifically, defendants continually emphasized the importance of "Alibaba Group's other privately held businesses, such as Taobao and Alipay, which we believe provides significant additional value." (*E.g.*, ER51-52¶43)

When defendants were eventually forced to reveal that they no longer owned or controlled Alipay, analysts considered it both shocking and significant. (ER65¶82) One reporter even directly asked if defendants were "lying" about when they knew about the information. (ER62¶73)

The context that defendants created for Alipay information and repeated again and again in the months before the Class Period – cannot be ignored. The context of the private companies' "significant additional value" informs how the market would have heard defendants' Class Period statements.

Such context is essential to analyzing material falsity. *Platforms Wireless*, 617 F.3d at 1095; *Warshaw*, 74 F.3d at 959; *Convergent*, 948 F.2d at 512. Again, while the district court summarized those facts at the beginning of its opinion, it never considered them in analyzing the falsity of the April 19, 2011 and May 10, 2011 statements. (ER1-33)

- 38 -

### 2. The District Court Acknowledged that Falsity Was Pled Viewing Facts in the Light Most Favorable to Plaintiff, but Then Erroneously Drew Inferences in Defendants' Favor Instead

The district court correctly held that the securities laws require disclosure of omitted facts when necessary to avoid misleading investors. (ER11) While "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5" (*Basic Inc. v. Levinson*, 485 U.S. 224, 239, n.17 (1988)), defendants are liable under the securities laws if they omit "material facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 131 S. Ct. at 1323, quoting 17 C.F.R. §240.10b-5(b). A defendants' statement is "actionable" if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *Berson*, 527 F.3d at 985.

Nonetheless, the district court reversibly erred in its analysis of whether defendants needed to disclose the Alipay transactions to make their Class Period statements not misleading. In part, the court erred by drawing inferences in defendants' favor, contrary to settled Rule 12(b)(6) law. *N.M. State*, 641 F.3d at 1094 (on review of dismissal, court "will 'accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs'").

- 39 -

The court expressly stated that defendants' April 19, 2011 earnings statement "does perhaps imply that there is some additional value from the privately held businesses" – meaning Alipay and Taobao. (ER15)  Similarly, the court held that "perhaps" defendants' statement "is intimating that the value of those [privately held] businesses has not changed in any way." (ER14)

But, the court called the reasonable inference a "stretch" (*id.*) and strained to defeat it by drawing every conceivable inference for defendants:

> Yet, it is specifically *not* a valuation of those businesses, nor does it state anything else about the state or nature of those businesses.  Moreover, as the Alibaba Group had several privately held businesses, implying that these together had *some* value not included in the public stock price of Alibaba.com is not misleading.

(ER15-16, emphasis in original)

All falsity inferences must be construed "in the light most favorable to plaintiffs." *Zucco*, 552 F.3d at 989; *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003).  The district court was not free to draw falsity inferences in defendants' favor.

Moreover, the court missed the point.  Even without assigning a specific value to Alipay, defendants' statements suggested Yahoo still had an interest in it – that there was *some* value.

For precisely that reason, defendants' statements here are different than the defendants' statements in *Brody*.  280 F.3d at 1006-07.  In *Brody*, plaintiffs identified

- 40 -

the information defendants omitted from their public statement, but did "not indicate why the statement [defendants] made was misleading." *Id.* at 1006. The district court here erred in holding the facts here to be like those in *Brody*, concluding that "[s]tating that the value of something is *not* included in the reported valuation of something else does not affirmatively create an impression of the value of that thing." (ER14, emphasis in original) But, as plaintiff explained, unlike the statement in *Brody*, defendants' statement here does affirmatively create a false impression that Alipay continued to have *some* value to the Alibaba Group – and, therefore, to Yahoo. Because defendants' statement was indeed misleading, *Brody* supports reversal.

Moreover, the court's hypothesis that defendants' comments could have been construed to refer to other privately held businesses is especially far-fetched since defendants had previously specifically named Alipay and Taobao in making a nearly identical statement about additional value of the Alibaba Group investment. (ER51-52¶43 (figures did "not include estimates of the value of Alibaba Group's other privately held businesses, such as Taobao and Alipay, which we believe provides significant additional value")) The court's hypothesis (ER15) is particularly troubling because the court later correctly acknowledged that "Alipay is a large part of the privately held value of the Alibaba Group. . . ." (ER28)

The court explicitly articulated its misunderstanding about the significance of value:

- 41 -

> It is hard to see how a statement that expressly *does not value* the privately held businesses affirmatively creates an impression that the *value is different* in a material way than the actual value. The statement itself says nothing about the value.

(ER16, emphasis in original) But, the point is not that defendants misstated Alipay's value. The point is that their statement implied that Alipay's value – whatever it is – was still relevant to Yahoo investors. That is a materially misleading impression.

The court did concede that if defendants' statement had included a projection of "value based on those [privately held] businesses," it "might" be actionable. (ER17) The statement *did* include a projection of value. Discussing the privately held businesses in the context of discussing valuation of the Alibaba Group investment implied that there was some continuing value to Yahoo in the privately held companies – meaning Alipay and Taobao.

The most reasonable inference an investor would draw from defendants' mention of the privately-held companies is that they had value for investors. Why else would defendants mention them?

More importantly, on the issue of falsity, plaintiff need not have the more or most reasonable of the inferences. Inferences supporting plaintiff's falsity claim must be construed "in the light most favorable to plaintiffs." *N.M. State*, 641 F.3d at 1094. To state a claim, plaintiff's theory need simply be "plausible." *Bell Atl. Corp. v.*

- 42 -

*Twombly*, 550 U.S. 544, 556-57 (2007); *see also Whitney v. Guys, Inc.*, No. 11-3050, 2012 U.S. App. LEXIS 22760, at *23-*28 (8th Cir. Nov. 6, 2012).

The district court again erroneously resolved "close question[s]" in defendants' favor in analyzing the May 10, 2011 false statements. (ER18-19) On May 10, 2011, defendants acknowledged the Alipay share transfer – but failed to mention that Yahoo had lost any control of Alipay because the VIE arrangement had been cancelled. (ER79-80¶¶122-123) Defendants also failed to mention that 100% of the shares of a $5-$6 billion asset had been sold for $46 million. (*Id.*)

The district court acknowledged that defendants failed to explain that "the Alibaba Group no longer had control of Alipay through a VIE." (ER18) But, again reaching to draw inferences in defendants' favor, the court said their statements made "clear that the transaction is potentially wide-ranging, with ongoing consequences, and a definitive restructuring of the company." (ER19) Despite twice calling it a "close question," the court concluded that defendants' statement was therefore not misleading.

The court erred. A reasonable investor would find "ongoing consequences" quite different from "gone." *Berson*, 527 F.3d at 987 ("learning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.") (emphasis in original).

- 43 -

Holding defendants' statements "not false or misleading" (ER17, 24) despite acknowledging they were "perhaps" (ER14) misleading if one "stretch[ed]" (*id.*) to view the alleged facts in the light most favorable to plaintiff and recognizing that they presented a "close question," (ER18-19) is reversible error. *N.M. State*, 641 F.3d at 1094. When the allegations are properly construed in the light most favorable to plaintiff, they amply allege falsity. The dismissal should be reversed.

### 3. Contrary to *Matrixx*, the District Court Inappropriately Raised the Standard from Misleading to "Necessarily Misleading"

The district court further reversibly erred in holding defendants' statements inactionable by ruling on an unreasonably elevated standard – holding that the statements were not "necessarily misleading." (ER14, 19)

In analyzing defendants' false April 19, 2011 statement, the court concluded that "intimating that the value of [the privately held] businesses has not changed in any way" "does not *necessarily* mislead." (ER14) Again, in resolving the "close question" of whether defendants' May 10, 2011 statement was materially misleading, the court held "the statement is not *necessarily* misleading because the explanation given is not in conflict with the more specific explanation Plaintiffs think should have been given." (ER19)

First, defendants' statement discussing any ongoing interest in Alipay was, indeed, "in conflict" with the concealed information that the VIE arrangement had

been terminated and the Alibaba Group – and therefore Yahoo – no longer had any control whatsoever over Alipay. The district court's contrary conclusion is a misreading of the facts.

Moreover, "necessarily" misleading is an inappropriately heightened pleading standard. A defendants' statement is "actionable" if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *Berson*, 527 F.3d at 985. A statement is actionable if it could mislead investors – not if it *necessarily* does.

Defendants are liable under the securities laws if they omit a "'material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Basic*, 485 U.S. at 230, n.6, quoting 17 C.F.R. §240.10b-5(b). "Necessary" modifies "a material fact" – not "misleading." Even at the proof stage, the "materiality requirement is satisfied when there is a *substantial likelihood* that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Matrixx*, 131 S. Ct. at 1318. Defendants' obligation under the securities laws is to make statements that are not misleading – not statements that are not *necessarily* misleading.

The court's heightened standard is a complete inversion of case law governing resolution of materiality – particularly at the pleading stage. As this Court recognizes,

- 45 -

"'the ultimate issue of materiality [is] appropriately resolved "as a matter of law" only where the omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality.'" *Siracusano*, 585 F.3d at 1178, quoting *TSC*, 426 U.S. at 450; *see also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 131 (2d Cir. 2011) (in the context of liability under §10(b) for alleged misstatements or omissions, dismissal on the basis that the misstatements or omissions are not material is unwarranted "unless the[se misstatements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

Thus, the Supreme Court and this Court hold that materiality may be resolved at the pleading stage only where the omission is *necessarily not* material.  Flipping that standard on its head, the district court held the omissions were not material – at the pleading stage – by holding that they were not *necessarily* material.

The district court's imposition of an inappropriately heightened standard for falsity is plain legal error and requires reversal.

- 46 -

**B.** **The District Court Reversibly Erred in Absolving Defendants of a Duty to Correct Their Statements to the Market that Misleadingly Created the False Impression that Yahoo Still Owned Alipay – When It Did Not**

In addition to making false statements during the Class Period, defendants also failed to correct the many false statements they had made prior to the Class Period – which they admit they knew were false by at least March 31, 2011. (ER60¶66)

Courts recognize a duty to correct statements of historical fact "that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331-32 (7th Cir. 1995); *accord In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002); *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430-31 (3d Cir. 1997). Upon discovery of the earlier false statement, defendants "must correct the prior statement within a reasonable time." *Stransky*, 51 F.3d at 1331.[2]

---

[2] The duty to correct is different than the duty to update – which applies to forward-looking statements as to which defendants subsequently learn information bearing on "an implicit factual representation that remained 'alive' in the minds of investors as a continuing representation." *Burlington*, 114 F.3d at 1431-32; *accord IBM*, 163 F.3d at 110. Typically, a duty to update is limited to "news of any radical change in the company's plans." *Burlington*, 114 F.3d at 1434. While the loss of Alipay arguably qualifies as such an event, plaintiff elects not to pursue this theory on appeal.

This Court does not appear to have expressly addressed a duty to correct. A few district courts within the Ninth Circuit have addressed the issue, yielding only one unpublished decision since 2007. *In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 80717, at *37 (N.D. Cal. Sept. 24, 2008) ("if defendant learned after he signed the prospectus that his prior statements were false at the time he made them, he had a duty to correct those misstatements").

The duty to correct makes common sense. While defendants do not have a duty to disclose all material facts of which they learn (*Matrixx*, 131 S. Ct. at 1322), defendants must reveal material facts "necessary in order to make the statements made . . . not misleading." *Id.* at 1323. If defendants learn that their "statements made" are no longer accurate, the duty to correct is simply a logical application of their obligation to reveal facts necessary to avoid misleading investors.

Here, defendants had a Class Period duty to correct many pre-Class Period statements. For example:

- On January 25, 2011 – after the Alibaba Group had sold 100% of its shares in Alipay – defendants Bartz and Morse told investors that 2010 fourth quarter and year-end financial results for Alibaba.com "do not include estimates of the value of Alibaba Group's privately held businesses, most notably Taobao and Alipay." (ER75¶109)

- On February 16, 2011– again, after the Alibaba Group had sold 100% of its shares in Alipay and terminated the VIE arrangement, leaving it with no control of Alipay – Morse said that Yahoo was focused on "long term value creation" and that the Alibaba Group CEO Ma and CFO Tsai were

- 48 -

running the companies well: "I think the strategy that they're pursuing with regard to Taobao, with regard to Alipay, fantastic." (ER77¶116)

By failing to correct their earlier false statements – which they admit they knew to be false by the time of the Class Period (ER60¶66) – defendants "allow[ed] investors to trade on the basis of potentially misleading information." *Sawant v. Ramsey*, No. 307-cv-980 (VLB), 2010 U.S. Dist. LEXIS 102899, at *53-*55 (D. Conn. Sept. 28, 2010). Based on the Complaint allegations, defendants had a duty to correct earlier statements they knew to be false.

The district court held that defendants did indeed have a duty to correct two statements made on February 16, 2011, but as discussed in Argument B.1. below, erroneously held defendants were reasonable in waiting six weeks to do so. (ER28) Further, as discussed in Argument B.2., the court held that plaintiff failed to explain "*how*" other statements – including the January 25, 2011 statement – "created the false impression that the Alibaba Group still owned and controlled Alipay" (ER22-23), erroneously failing to draw the extremely reasonable inference that defendants' specific mention of Alipay would mislead investors to believe Yahoo still had some interest in Alipay. Finally, as discussed in Argument B.3., the court held defendants had no duty to correct their January 25, 2011 statement because defendants did not state "Alipay" (ER26), contradicting its own prior rulings that utterance of the word was not dispositive. (ER15, 17)

- 49 -

1. **Although the District Court Held that Defendants' February 16, 2011 Statements Did Trigger a Duty to Correct, the Court Erroneously Allowed Defendants to Continue to Conceal the Truth While They Explored "Avenues of Response" – When There Was No Doubt About the Facts that Had Occurred**

The district court held that two statements by defendants on February 16, 2011 "gave rise to a duty to correct." (ER28) Because "Ma had unilaterally terminated the VIE giving Yahoo any de facto control over the company" (ER27), the court found that defendants' following statements required correction:

- Morse's statement that "the strategy being pursued with regards to Alipay is 'fantastic.'" (*Id.*)

- Morse's statement that "Jack and Joe were 'creating a lot of value there [the Alibaba Group generally]. It will be worth a lot more in the coming years than it is now.'" (*Id.*)

Even beyond strong allegations showing defendants knew about the VIE transfer when it happened (ER61¶¶68-69), defendants themselves admit they knew about the VIE transfer by March 31, 2011 (ER60¶66) – and said nothing about it to investors until May 12, 2011. (*Id.*)

Nonetheless, the court held defendants' failure to correct their February 16, 2011 statements "non-actionable" because it found "the delay in correction reasonable." (ER28, 31-33) The court reached its conclusion by indulging all inferences in defendants' favor that it could "[a]rguably," "not inconceivabl[y]," or "likely" reach. (ER32-33) As with its analysis of defendants' affirmative Class

- 50 -

Period statements, the court's failure to view the duty-to-correct facts in the light most favorable to plaintiff – and, indeed, its stretches in the opposite direction – requires reversal. *N.M. State*, 641 F.3d at 1094; *Zucco*, 552 F.3d at 989.

The court's conclusion was error. There was no legitimate justification for defendants' six-week delay in correcting statements they admit they knew were false.[3] Indeed, defendants had known a substantial portion of the facts supporting falsity for nearly two years by the time they spoke. (ER37-38¶3; ER61¶70) They had had ample time to contemplate "avenues of response." (ER33)

The court relied on *Higginbotham* for the proposition that defendants "'are entitled to investigate for a reasonable time, until they have a full story to reveal.'" (ER31, quoting *Higginbotham* 495 F.3d at 760-61) But, in *Higginbotham*, defendants did not become aware of *facts* rendering their prior statements false: "[t]he most one can say is that, sometime during May 2004, [defendant] learned enough to lead a reasonable person to conduct an investigation." *Higginbotham*, 495 F.3d at 758. The Seventh Circuit held, "[t]hat is exactly what [defendant] did during the next two months, demonstrating a pursuit of truth rather than reckless indifference to the truth." *Id.*

---

[3]    The district court accepted defendants' calculation that March 31, 2011 to May 12, 2011 was "approximately five weeks." (ER31) It was exactly six weeks.

- 51 -

Here, unlike in *Higginbotham*, defendants learned the facts – and exhibited reckless indifference to them.  They admit they knew the Alibaba Group no longer owned any shares nor held any control of Alipay as of March 31, 2011.  (ER60¶66) They did not receive information that suggested they should conduct an investigation. They received facts.

There was nothing to investigate.  Alipay was gone.  They had only $46 million to show for an investment most recently valued at $5-$6 billion.  Those were facts.

It is true that defendants had not yet figured out how they were going to fix the problem.  But, the securities laws do not require disclosure of problems only once a solution has been reached.  Defendants owed their investors a duty to correct their prior false statements once they knew they were false.  *Stransky*, 51 F.3d at 1331; *Burlington*, 114 F.3d at 1430-31; *Cabletron*, 311 F.3d at 36; *IBM*, 163 F.3d at 109.

## 2. Defendants' False Pre-Class Period Statements Were Far More than Vague Statements of Optimism, Particularly in Light of the Impression Defendants Had Deliberately Cultivated in the Marketplace

The district court concluded that certain other statements that might have triggered a duty to correct – including defendants' January 25, 2011 statement above – were simply inactionable "expressions of enthusiasm."  (ER24)  The court acknowledged that "'even optimistic statements, when taken in context, might constitute a basis for a claim.'"  (*Id.*, quoting *Warshaw*, 74 F.3d at 959)  But, the court

held that plaintiff did not "point to any specifics to support how or why these statements fall into that category." (ER24)

As discussed in Argument A.1., the "context" was defendants' deliberate conditioning of the market to understand that Alipay was the gem of the Alibaba Group investment and "provide[d] significant additional value." (*e.g.*, ER51-52¶43) Similarly, in *Warshaw*, the "context" that this Court found sufficient to make an otherwise merely "optimistic" statement actionable was ongoing concern about the United States Food and Drug Administration ("FDA") approval of defendants' main product at a time when defendants allegedly knew the drug "would never be approved by the FDA." 74 F.3d at 959.

Correctly read in context of defendants' earlier statements, defendants' January 25, 2011 statement that 2010 fourth quarter and year-end financial results for Alibaba.com "do not include estimates of the value of Alibaba Group's privately held businesses, most notably Taobao *and Alipay*" (ER75¶109) was false. As of January 25, 2011, defendants did not own any shares in Alipay – and defendants admit they knew that by March 31, 2011. (ER60¶66) At least by March 31, 2011, defendants had a duty to correct their earlier statement – and the court's contrary ruling requires reversal.

- 53 -

> **3.     The Court Erroneously Excused Defendants from Correcting False Statements by Holding Defendants' Failure to Specifically Mention "Alipay" Was Dispositive – Despite Having Earlier Held "the Definitive Issue Is Not the Use of the Word 'Alipay'"**

On January 25, 2011 – after the Alibaba Group had transferred 100% of the Alipay shares – defendant Bartz also said that the Alibaba investment "continues to be a great investment" with a "bright future" that will "grow in value and continue to greatly benefit our investors over time."  (ER75¶109)  Overlooking that defendant Morse has expressly mentioned "Alipay" in the same conference call (public market quotes "do not include estimates of the value of Alibaba Group's privately held businesses, most notably Taobao *and Alipay*" (*id.*)), the court held that Bartz's statements were not actionable because she did "not mention Alipay."  (ER26)

The court's analysis is troubling for its inconsistency.  In ruling on falsity, the court twice held that specific use of the word "Alipay" was not relevant to its determination of whether falsity was pled.  (ER15 ("the definitive issue is not the use of the word 'Alipay'"); ER16-17 ("Defendants need not utter the magic word 'Alipay' to trigger their duty to disclose the Alipay restructuring."))  Rather, the court held that defendants' April 19, 2011 statement was not actionable because it did not include the value of *any* of Alibaba's privately held businesses (ER15), nor provide any "projection of growth of revenue or value based on those businesses."  (ER17)  The court concluded that there was nothing actionable about defendants' statements about

- 54 -

any of the private businesses, carefully acknowledging that the failure to name "Alipay" as one of those businesses was not the issue.

In ruling on defendants' duty to correct their January 25, 2011 statement, however, the court reached an opposite conclusion. When defendants spoke, Yahoo owned no shares of Alipay (ER53¶46; ER59¶62) – a fact defendants admit they knew by March 31, 2011. (ER60¶66) Yet, Bartz touted the "great investment" in Alibaba that will "grow in value and continue to greatly benefit our investors over time," in a call where Morse specifically mentioned "Alipay" – and neither acknowledged that Alipay was gone. (ER75¶109)

The court held neither Bartz nor Morse (*Barrie*, 409 F.3d at 656) had a duty to correct Bartz's statement because "it does not mention Alipay." (ER26) Unlike its earlier holding, the court did not find that there was no discussion of the value of the private businesses generally. Instead, the court held that "[t]he actual statement points to the specific reasons that Alibaba is likely to grow in value – Taobao and Alibaba.com, which are the topics of the discussion." (*Id.*) Despite the fact that defendants routinely linked discussion of Alipay and Taobao, and that Morse referenced "Alibaba Group's privately held businesses, most notably Taobao *and Alipay*" in the same conversation (ER75¶109), the court held that "the omission of Alipay is not misleading." (ER26)

Contrary to its earlier holding, the court here held that plaintiff's claim was not adequately pled because plaintiff did not allege that defendants "utter[ed] the magic word." (ER17) But they did. Moreover, the court's inconsistent ruling was erroneous and supports reversal of the dismissal.

### C. The District Court Reversibly Erred in Entering Judgment Without Even Addressing Plaintiff's Leave to Amend Request, Particularly Where the Complaint Alleges Adoptive Admissions that Support Both Falsity and Scienter

The facts alleged plead that defendants admitted their fraud by adoption.

On May 10, 2011, defendants filed Yahoo's Form 10-Q for the first quarter of 2011, disclosing publicly for the first time that 100% of Alipay stock was transferred to Chinese ownership. (ER60¶65; ER79¶122) On May 12, 2011 – after the Alibaba Group publicly announced that the restructuring had occurred in 2010 – defendants belatedly admitted that the share transfer had indeed occurred on August 6, 2010 and the termination of the VIE arrangement on January 27, 2011, but still claimed they did not learn of either event until March 31, 2011. (ER60¶66; *see* ER59¶62; ER60¶67; ER78¶118) Defendants specifically maintained that both transactions occurred without the knowledge or approval of the Alibaba board of directors. (ER60¶66)

The very next day, on May 13, 2011, the Alibaba Group issued a responsive and contradictory press release. (ER61¶68) The Alibaba Group said defendants knew of the Alipay transfer on August 6, 2010 and knew that the VIE arrangement was

- 56 -

terminated on January 27, 2011 – both well before March 31, 2011.  (*Id.*)  The Alibaba Group specified that its board of directors, including defendant Yang, discussed the transfers at numerous Alibaba board meetings, including the July 2009 meeting.  (*Id.*)

Unlike Alibaba's prompt and explicit retort to defendants' denial of timely knowledge, and despite repeated questions from analysts, defendants Yang and Bartz refused to say anything more about when they knew about the Alipay transfers.  (ER66-68¶¶86-91; ER81¶127)  As fully discussed in Section F of the Statement of Facts, defendants maintained their silence from May 13, 2011 until July 28, 2011.

Analysts questioned.  (*E.g.*, ER67-68¶91)  Defendants stonewalled.  (*Id.*)  Indeed, even when Ma essentially publicly accused defendants of "lying" (ER62¶73), defendants neither denied nor even addressed his accusations.  (ER67-68¶91; ER81¶127)   As discussed below, their ongoing silence constituted adoptive admissions of falsity and scienter.

### 1. An Adoptive Admission May Be Manifested by Silence or Equivocation and Is Relevant to Allege Both Scienter and Falsity

Silence may be treated as an adoptive admission if the party knew of and understood the statement, and the statement was made under the circumstances where a reasonable person would speak out to clarify, deny, or correct the statement of another if it were untrue.  *United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir.

1975); *see also United States v. Giese*, 597 F.2d 1170, 1196 (9th Cir. 1979) (affirming adoptive admission by silence); *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991) (same).

The Federal Rules of Evidence acknowledge adoptive admissions. A party may by words or conduct manifest the intent to adopt or acquiesce in the statement of another. *See* Fed. R. Evid. 801(d)(2)(B); *see also* Fed. R. Evid. 801, Notes of Advisory Committee on Rules.

This Court has also held that an equivocal response – "Next question please" – by a corporation's chief operating officer in response to an accusation made during a press conference that defendant was "cooking the books" was admissible as an adoptive admission by silence because the "natural response to such an accusation would be to address or deny it." *Henke*, 222 F.3d at 642.

*Henke* controls here and warrants recognition of defendants' adoptive admission of the falsity of their May 10 and 12, 2011 misstatements. (ER60¶¶65-66; ER79-80¶¶122-123) Defendants' continued refusal to respond to analysts' pointed inquiries in the face of explicit accusations that they were "lying" about what and when they knew about the Alipay transfers constitutes adoptive admissions by silence of the knowing falsity of their May 10 and 12, 2011 statements. It supports both falsity and scienter.

### 2. Plaintiff Can Amend to Expressly Articulate Its Adoptive Admission Argument

Plaintiff acknowledges that, although the relevant facts are all pled, an adoptive admissions theory is advanced here for the first time and was not specifically preserved as part of the merits opposition to dismissal of the amended complaint. Importantly, however, the instant dismissal was the district court's first substantive ruling on the merits. Plaintiff requested leave to amend. (Doc. 77 at 31) The court denied plaintiff the benefit of its guidance, entering judgment in its first order without even mentioning leave to amend. (ER1-33, 99)

This Court has held that when "the district court failed to provide sufficient reasons to overcome the presumption in favor of granting leave to amend, we reverse the judgment." *Eminence Capital*, 316 F.3d at 1049. In this case, the district court failed to provide any reason for dismissing without leave to replead – despite the fact that plaintiff asked for leave, citing *Eminence Capital*. (Doc. 77 at 31) Such failure to provide reasons constitutes an abuse of discretion. *Eminence Capital*, 316 F.3d at 1052.

This Court has also emphasized that Rule 15 is "'to be applied with extreme liberality'" (*id.* at 1051), especially when, as here, there has been no previous substantive ruling on the sufficiency of the complaint and the district court acknowledged there were "close questions" (ER18-19, 26) whether the complaint

- 59 -

satisfied applicable pleading standards. *Eminence Capital*, 316 F.3d at 1051. *Eminence Capital* further recognized that pleading "additional theories not previously alleged" was an especially appropriate basis for allowing leave to amend. *Id.* at 1053.

This Court holds that denial of leave to amend "is improper unless it is clear that the complaint could not be saved by any amendment." *Zucco*, 552 F.3d at 989. Here, plaintiff can amend to plead adoptive admissions of defendants' knowing falsity of their May 10 and 12, 2011 misstatements. (ER60¶¶65-66; ER79-80¶¶122-123) *Zucco* and *Eminence Capital* require that plaintiff be given that opportunity.

### D. The District Court Also Erroneously Dismissed the Control Person Claim

The district court dismissed plaintiff's §20(a) claim on the sole ground that plaintiff "failed to plead a primary violation 10(b)." (ER33) Because multiple errors require reversing dismissal of plaintiff's §10(b) claim, dismissal of the §20(a) claim should also be reversed.

- 60 -

## X.   CONCLUSION

For the reasons set forth above, the district court's dismissal of both the §10(b)

and §20(a) claims should be reversed.

DATED:  December 27, 2012         ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                  SANFORD SVETCOV
                                  SUSAN K. ALEXANDER
                                  ANDREW S. LOVE
                                  CHRISTOPHER P. SEEFER
                                  ARMEN ZOHRABIAN


                                        s/Susan K. Alexander
                                  _____
                                     SUSAN K. ALEXANDER

                                  Post Montgomery Center
                                  One Montgomery Street, Suite 1800
                                  San Francisco, CA  94104
                                  Telephone:  415/288-4545
                                  415/288-4534 (fax)

                                  Lead Counsel for Plaintiff-Appellant

- 61 -

772932_1

**STATEMENT OF RELATED CASES**
(Circuit Rule 28-2.6)

Appellant's counsel is not aware of any related cases pending before this Court.

s/Susan K. Alexander
SUSAN K. ALEXANDER

## RULE 32(a)(7)(C) CERTIFICATE

The undersigned counsel certified that Appellant's Opening Brief uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,326 words according to the word count provided by Microsoft Word 2002 (or 2003) word processing software.

s/Susan K. Alexander

SUSAN K. ALEXANDER

772932_1

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California 94104.

2.      I hereby certify that on December 27, 2012, I electronically filed the foregoing document: **APPELLANT'S OPENING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

3.      I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 27, 2012, at San Francisco, California.

s/Tamara J. Love
TAMARA J. LOVE

772932_1